## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| PFG VENTURES, L.P., | ) | Case No. 1:22-cv-01177 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Jonathan D. Greenberg |
| BRANDON C. KENNEDY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff PFG Ventures, L.P. is the owner of the Proforma franchise system, which sells promotional products, commercial printing, printed apparel, point-of-purchase displays, multi-media services, and related business supplies.  One of PFG's franchisees terminated its agreement with Proforma and affiliated with a competitor. This development triggered a bitter, personal, and contentious business divorce and, so far, two lawsuits.  When Proforma learned that the franchisee downloaded certain confidential and proprietary information and various trade secrets, Proforma sought a preliminary injunction.  For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** the motion for a preliminary injunction.

## FINDINGS OF FACT

The Court held a hearing on the motion for a preliminary injunction on July 12 and 13, 2022. (Minutes of Proceedings, Jul. 13, 2022.) The Court heard testimony from the following witnesses:  Vera Muzzillo, the CEO of PFG Ventures; Brian Carothers, the Chief Technology Officer for PFG Ventures; Defendant Brandon

Kennedy; Justin Zavadil, President of American Business Promotions; and Greg Nelson, Director of Acquisitions and Transitions at American.  Further, the Court admitted Plaintiff's Exhibits A through R and T and Defendant BKEN's exhibits 1, 4, 6, and 11 through 16.  Based on this evidence, the Court makes the following findings of fact.

### A.     Franchise Agreement

In 2004, Proforma entered into a franchise agreement with Defendant Brandon Kennedy.  At the expiration of that agreement's ten-year term, in 2014, Proforma entered into a superseding franchise agreement with Mr. Kennedy's company BKEN, Inc., doing business as Proforma Progressive Marketing.  By agreement, the parties amended the franchise agreement three times between 2014 and 2021.  At Mr. Kennedy's initiative, and as was his right, he terminated his franchise agreement with Proforma effective August 3, 2021.

Pursuant to the franchise agreement's terms, a franchisee may terminate the agreement without cause.  (ECF No. 1-1, ¶ 13(f), PageID #42.)  Under Section 13(f) of the agreement, the franchisee is obligated to provide Proforma with sixty days prior written notice of termination, pay all amounts owed to Proforma, and pay an account acquisition fee if the franchisee desires to continue serving its accounts.  (*Id.*)  The agreement contains a formula for calculating the amount of the account acquisition fee.  (*Id.*)

If the franchisee does not pay the account acquisition fee, the franchisee is subject to certain covenants for a period of one year after the agreement terminates.  (*Id.*, ¶ 11(c), PageID #39.)  First, the franchise agreement bars the franchisee from

contacting any person or organization which was, at any time during the two-year period before termination, a customer to which the franchisee sold Proforma products or services for the purpose of selling any product or service similar to Proforma's. (*Id.*) Second, the agreement bars a franchisee from contacting any vendor or supplier with which the franchisee transacted business while operating its Proforma franchised business. (*Id.*)

Under the agreement, Proforma may also terminate the agreement and all the franchisee's rights on the occurrence of any one of twelve enumerated defaults. (*Id.*, ¶ 13, PageID #41.) One such default occurs where the franchisee "violate[s] or permit[s] a violation of any covenant of confidentiality contained in Paragraph 8 of this Agreement." (*Id.*)

Paragraph 8 of the agreement describes Proforma confidential information. (*Id.*, ¶ 8, PageID #38.) It provides that the Proforma Confidential Operations Manual, the Proforma System, and Proforma University's training materials contain trade secrets and confidential information. (*Id.*) The Proforma System refers to the central network storing financial information, customer and vendor lists, processes and designs, and other information Proforma uses to run its franchise. Further, Paragraph 8 provides that the franchisee may not "copy or disseminate contents of the Proforma System training materials, Manual or our Team Proforma 400 Program and Group 2 Program without" Proforma's approval. (*Id.*) The agreement states that "[b]ecause legal damages could not adequately compensate us, you agree that a court should enjoin you from any further unauthorized use or disclosure of the Proforma

3

System, Manual, our Team Proforma 400 Program, Group 2 Program or their contents if we sue you." (*Id.*)

Paragraph 14 of the agreement provides that, on termination of the agreement, the franchisee is required to return to Proforma "all copies of the Manual, our Team Proforma 400 Program and Group 2 Program materials, PROvision and its manuals, our trade secrets and confidential materials and all our other property." (*Id.*, PageID #42.)

### B.    Guarantor Agreement

On each occasion Mr. Kennedy or his company entered into a franchise agreement with Proforma or amended the agreement, Mr. Kennedy and his wife Christina Kennedy each signed a guaranty. The most recent guaranty, dated March 9, 2021, is attached as an exhibit to the complaint. (ECF No. 1-2.)  Under that agreement, the Kennedys each guaranteed the performance of all of BKEN's obligations under the franchise agreement. (*Id.*, PageID #66 & 68.)  Consequently, the Kennedys are liable for BKEN's violations of the franchise agreement and for Proforma's expenses enforcing the franchise agreement or the guaranty. (*Id.*)

### C.    Pre-Termination Developments

Before the termination of his franchise agreement with Proforma, Mr. Kennedy began developing a relationship with Defendant American Business Promotions.  American, which does business as American Solutions for Business, is a distributor of print, promotional products, office supplies, eCommerce, and marketing solutions.  As a competitor of Proforma, American provides its products

4

through a network of sales associates and affiliates, who control their individual businesses, instead of operating on a franchise model.

In 2019, Mr. Kennedy first connected with American about the possibility of joining American.  Mr. Kennedy's discussions with American followed a lengthy period of dissatisfaction with Proforma that dated back to at least 2015 when Proforma began to add or increase service fees for franchisees.  At about the same time, Mr. Kennedy joined Proforma's technology committee, perhaps because of his longevity and success with Proforma, efforts to address the cause of his concerns, or some combination of the two.  Mr. Kennedy also served on Proforma's owners' advisory council for approximately four years, serving on committees for marketing and business development.  In these roles, Mr. Kennedy had access to the Proforma System as well as Proforma's strategic information.

As his discussions with American progressed, Mr. Kennedy shared information about his franchise with American, including information about his franchise's financial performance, staffing, sales, overhead, and accounting information.  By February 2020, Mr. Kennedy confirmed by email to a representative of American that Mr. Kennedy had retained a lawyer in California to review his Proforma franchise agreement and advise him on ending his relationship with Proforma.  He also inquired of American about efforts "to duplicate the current stores we currently have live and get them off and away from Proforma's servers," among many other issues related to joining American.  (Exhibit G.)

Beginning in October 2020, Mr. Kennedy downloaded from Proforma's PROvision II system 27 to 30 marketing materials and templates and stock pieces available for franchisees to use. At this time, Mr. Kennedy was still a Proforma franchisee but knew he wanted to leave Proforma. After October 2020, Mr. Kennedy accessed Proforma's systems to download other information, including aging reports, accounts receivable information relating to suppliers, and other reports relating to his franchise.

### D.  Termination of 2014 Franchise Agreement

On June 4, 2021, Mr. Kennedy provided written notice to PFG Ventures that BKEN was terminating its franchise agreement. Pursuant to the sixty-day written notice requirement in the agreement, the termination became effective August 3, 2021. In the notice, Mr. Kennedy advised that he was exercising his right under the franchise agreement to retain his clients by paying the account acquisition fee. The parties disagree about the amount due under the agreement for the account acquisition fee.

During the sixty-day notice period, Mr. Kennedy provided to American a list of the vendors his franchise worked with. (Exhibit 16.) He obtained this list by logging into the Proforma System and taking screen shots of it.

After the formal termination of his Proforma franchise, Mr. Kennedy retained access to the Proforma System and continued to receive notices and information relating to his service on the technology committee. Apparently, Proforma's chief technology officer did not block Mr. Kennedy's access to the Proforma System or other databases. In fairness to him, Proforma's owner testified and confirmed that the

company generally allows former franchisees access the system to allow them to complete their orders and answer any questions as they transition their business.

Shortly after the formal termination of his Proforma franchise, Mr. Kennedy sent an email to American attaching various financial information about his business, which contained quantitative information about Proforma's overhead, but also including a report of historical net proceeds for Mr. Kennedy's franchise from the Proforma System from July 16, 2021 to July 31, 2021. He also ran a report in the Proforma System with a great deal of information about his vendor relationships and payments. He did so to make sure he could continue to service his accounts, notwithstanding the covenants in the franchise agreement prohibiting doing business with and contacting vendors and customers without payment of the account acquisition fee.

Further, the record shows that Mr. Kennedy is in possession of a large volume of propriety and confidential information as well as trade secrets from Proforma. These include a preferred partner sourcing guide; pricing and other information for Proforma's preferred vendor network; training and other manuals, which include competitive information about Proforma's business; vendor and customer lists and contact information; and an electronic bill report for Mr. Kennedy's franchise for the 2020 fiscal year spanning some 120 pages.

On cross-examination, Mr. Kennedy conceded that at least some of the Proforma information he provided to American would provide a competitive advantage to the extent the information was not already publicly known. In that

regard, the record establishes that some but not all information Proforma considers trade secrets is available publicly.

### E.    Post-Termination Developments

In August 2021, after termination of his franchise agreement with Proforma, Mr. Kennedy affiliated with American.  American grows its business informally through referrals, advertising, and an annual conference it hosts for prospects.  Since joining American, Mr. Kennedy has introduced Proforma franchisees to members of American's management to explore whether they should also join American. Mr. Kennedy has made at least seven email introductions of this nature, and the Proforma franchisees he has targeted are among Proforma's most successful and productive.  Given the circumstances of his departure, Mr. Kennedy appears to have calibrated his efforts in this regard to inflict maximum pain on Proforma.

In March 2022, Mr. Kennedy introduced Proforma franchisee Darren Golden to American's management.  Greg Nelson, the Director of Acquisitions and Transitions for American, discussed with Golden his prospects at American and asked Golden for a list of the vendors his franchise primarily uses.  In April 2022, Golden emailed Nelson a list of forty of his franchise's top vendors.  In addition to showing the vendors' names, the list showed information relating to the amounts purchased by vendors and the vendor's level in Proforma's preferred vendor program. None of Proforma's relationships with the listed vendors has changed since the Proforma franchise owner disclosed the information to American.  However, several active Proforma franchisees, including those Mr. Kennedy introduced to American, recently downloaded or exported a large volume of confidential and proprietary

information from the Proforma system.  Some information from the Proforma System these active franchisees generated was sent to American.

## STATEMENT OF THE CASE

Plaintiff filed suit against American, BKEN, and Brandon and Christina Kennedy.  (ECF No. 1, ¶¶ 10–13, PageID # 4.)  Against Brandon Kennedy, BKEN, and American, Plaintiff asserts claims for tortious interference with business and contractual relations; civil conspiracy; and unfair competition.  (ECF No. 1, ¶¶ 81–106, PageID #19–22.)  Against American only, Plaintiff asserts claims for misappropriation of trade secrets under the Ohio Uniform Trade Secrets Act and for replevin.  (*Id.*, ¶¶ 72–80, PageID #17–19; *id.*, ¶¶ 107–10; PageID # 23.)  Finally, against BKEN and Brandon and Christina Kennedy, Plaintiff asserts a claim for breach of contract.  (*Id.*, ¶¶ 111–23, PageID #23–25.)

Plaintiff seeks damages on its claims for misappropriation of trade secrets, tortious interference, and unfair competition, including exemplary damages against American for its misappropriation of Plaintiff's trade secrets.  (*Id.*, PageID #26.)  Further, Plaintiff seeks a preliminary and permanent injunction enjoining American, BKEN, and Brandon Kennedy.  (*Id.*, ¶ 123, PageID #25.)  In its motion for a preliminary injunction, Plaintiff seeks to enjoin American, BKEN, and Brandon Kennedy based on Plaintiff's claims for misappropriation of trade secrets, tortious interference with business and contractual relations, and breach of contract.  (ECF No. 3.)  Plaintiff advances no argument based on its claims for civil conspiracy or unfair competition.  (*See id.*)

9

## GOVERNING LEGAL STANDARD

"A preliminary injunction is an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (quoting 11A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2948, p. 129 (2d ed. 1995)). "The purpose of a preliminary injunction is to preserve the status quo until a trial on the merits." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 848–49 (6th Cir. 2017) (citing *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). A preliminary injunction cannot be issued based on past harm. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210 (1995). Rather, its purpose is to prevent future irreparable harm. *Id.*

When a party seeks a preliminary injunction, a district court balances the following factors: (1) the movant's likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without an injunction; (3) whether the injunction would cause "substantial harm" to others; and (4) whether the public interest is served. *See Wilson v. Williams*, 961 F.3d 829, 836 (6th Cir. 2020); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As the movants, Plaintiff bears "the burden of justifying such relief." *Wilson*, 961 F.3d at 837 (citing *American Civ. Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015)).

Defendants contend that Plaintiff must make each of these showings by clear and convincing evidence. (ECF No. 17, PageID #149; ECF No. 18, PageID #178–79.) But this is not the applicable law. Defendant American relies on authorities under

Ohio law involving covenants not to compete, and the parties agree and the record establishes that there is no non-compete here. (*See, e.g.*, ECF No. 18, PageID #172.) Specifically, Ohio law requires a party to establish by clear and convincing evidence that such a covenant is enforceable. *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 366 (6th Cir. 2022). Defendants' other authorities largely agree. *See, e.g.*, *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (not mentioning clear and convincing standard); *S. Glazer's Distribs. of Ohio*, 860 F.3d at 848.

At most, the authorities on which Defendants rely recognize that, for an injunction to issue, the plaintiff must show a "clear case" of irreparable injury. For example, in *Garlock, Inc. v. United Seal Inc.*, 404 F.2d 256, 257 (6th Cir. 1968) (citation omitted), the Sixth Circuit wrote that the plaintiff has the burden of "establishing a clear case of irreparable injury and of convincing the Court that the balance of injury favored the granting of the injunction." More recently, although some cases purport to apply the clear-and-convincing standard for which Defendants advocate, *see, e.g.*, *Just Funky, LLC v. Boom Trendz, LLC*, No. 5:21-CV-1127, 2021 WL 2635377, at *2 (N.D. Ohio June 25, 2021) (motion for a temporary restraining order), those cases in turn rely on precedent demanding that the party seeking an injunction "prov[e] that the circumstances clearly demand" such an extraordinary remedy. *See Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). In considering Plaintiff's motion for a preliminary injunction, the Court does so applying this correct legal standard, not the one for which Defendants argue.

11

## ANALYSIS

A federal court exercising diversity jurisdiction must apply the choice-of-law rules of the forum State.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941).  Ohio law strongly favors upholding the parties' chosen law in a contract.  *Wise v. Zwicker & Assocs.*, 780 F.3d 710, 715 (6th Cir. 2015) (citation omitted).  The franchise agreement between Proforma and BKEN. provides that Ohio law governs.  (ECF No. 1-1, ¶ 21, PageID #44.)  Similarly, the guaranty between Plaintiff and Brandon and Christina Kennedy provides that Ohio law governs.  (*Id.*, PageID #48–51.)

Similarly, Ohio law governs the claims for misappropriation of trade secrets, tortious interference, and other tort claims because Ohio is the place where the injury allegedly occurred.  *See Avery Dennison Corp. v. Juhasz*, 924 F. Supp. 2d 893, 897–98 (N.D. Ohio 2013).  Further, the parties agree that Ohio law provides the rules of decision.  (ECF No. 3, PageID #87–88; ECF No. 18, PageID #179; *see generally* ECF Nos. 22 & 23.)

## I.     Likelihood of Success on the Merits

Where there is no likelihood of success on the merits, an injunction is unwarranted.  *Union Home Mortg.*, 31 F.4th at 367 (citing *S. Glazer's Distribs. of Ohio*, 860 F.3d at 849).

### I.A.    Trade-Secret Claim Against American

Under the Ohio Uniform Trade Secrets Act, a plaintiff may recover damages from a party that misappropriated the plaintiff's trade secrets. Ohio Rev. Code § 1333.63(A).  Under the statute, "misappropriation" means the "[a]cquisition of a

trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.* § 1333.61(B). It also means the disclosure or use of another's trade secret without the other's consent, if acquired by improper means, in breach of a duty of secrecy, or with the knowledge that it was a trade secret and had been acquired by accident or mistake. *Id.* "Improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1333.61(A).

To prevail on a trade-secret claim under Ohio law, then, "a plaintiff must prove: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Advance Wire Forming, Inc. v. Stein*, No. 1:18-cv-723, 2020 WL 5026523, at *19 (N.D. Ohio Aug. 25, 2020) (citing *Tomaydo-Tomahhdo, L.L.C. v. Vozary*, 2017-Ohio-4292, 82 N.E.3d 1180, ¶ 9 (Ohio Ct. App. 2017)); *see also Heartland Home Fin., Inc. v. Allied Home Mortg. Cap. Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008).

### I.A.1. Existence of a Trade Secret

Under Ohio law, a "trade secret" means information that: "(1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *AK Steel Corp. v. Pittsburgh Logistics Sys., Inc.*, No. 1:16CV1032, 2017 WL 194349, at *3 (S.D. Ohio Jan. 18, 2017) (citing Ohio Rev. Code § 1333.61(D)).

The Ohio Supreme Court has established a six-factor test for determining whether information constitutes a trade secret under Ohio's version of the Uniform Trade Secrets Act:  (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.  *State ex rel. The Plain Dealer v. Ohio Dep't of Ins*., 80 Ohio St. 3d 513, 525, 1997-Ohio-75, 687 N.E.2d 661, 672 (1997).  "A plaintiff is required to identify a trade secret with specificity to separate the secret from general knowledge."  *AtriCure, Inc. v. Jian Meng*, 842 F. App'x 974, 980 (6th Cir. 2021) (citing *Alice's Home v. Childcraft Educ. Corp*., No. 09AP-299, 2010 WL 3448319, at *4 (Ohio Ct. App. Sept. 2, 2010).

Plaintiff has sufficiently identified at least some information and materials that constitute trade secrets.  These are identified, for example, in Paragraph 8 of the franchise agreement, which specifically identifies the Proforma Confidential Operations Manual, the Proforma System, and the Proforma University training materials as containing trade secrets and confidential information.  Proforma's owner testified to the economic value Proforma derives from these materials and the efforts Proforma undertakes to guard the secrecy of the materials.  These efforts include requiring franchisees to agree to confidentiality agreements in the franchise

14

agreement and master software agreement, training franchisees on confidentiality and security, and password protecting and controlling access to the Proforma System. Indeed, only a handful of individuals have access to the key areas of the Proforma System from which some of the materials at issue originate.

### I.A.2. Precautions to Protect Trade Secrets

Defendants argue that Proforma has not sufficiently identified the trade secrets at issue, conflates information that is confidential, proprietary, and a trade secret, and failed to quantify the value it derives from the trade secrets at issue. At this stage of the proceedings, however, Plaintiff need only show a likelihood of success on the merits of these issues, and it has done so.

But Plaintiff's trade-secret claim falters on a different issue—Proforma's diligence to protect the trade secrets at issue. As a formal matter, these efforts fall under the statutory definition of a trade secret, which requires efforts reasonable under the circumstances to maintain secrecy. *See* Ohio Rev. Code § 1333.61(D), *AK Steel*, 2017 WL 194349, at *3. They also implicate the third factor of the Ohio Supreme Court's test for determining whether information constitutes a trade secret—the precautions taken to guard the secrecy of the information. *See State ex rel. Plain Dealer*, 80 Ohio St. 3d at 525, 1997-Ohio-75, 687 N.E.2d at 672.

The record shows that Proforma failed to take reasonable steps to protect the information at issue in three important respects. *First*, although Proforma provided some guidance to Mr. Kennedy about his departure as a franchisee from Proforma, the record shows that Proforma did not follow up in any meaningful way to secure return of its trade secrets. At most, Proforma provided Mr. Kennedy with a checklist

15

for departing franchisees that included, among other things, directions and reminders about confidentiality and Proforma's proprietary information and trade secrets.  But no evidence suggests that Proforma made specific requests for or followed up on this checklist with Mr. Kennedy.  Although the franchise agreement obligates Mr. Kennedy to return this information, the Court determines that it is not reasonable for Proforma to stand on a contractual obligation and generic form checklist, particularly where a franchisee joins a direct competitor.

*Second*, after the termination of the franchise agreement, Proforma failed to act with diligence to protect its trade secrets.  The termination of Mr. Kennedy's franchise took effect in early August 2021.  Although Mr. Kennedy and Proforma had a dispute over the amount of the account acquisition fee, which resulted in a separate lawsuit related to this one, *see PFG Ventures, L.P. v. BKEN, Inc.*, No. 1:21-cv-2205 (filed Nov. 19, 2021 N.D. Ohio), the record contains no evidence that Proforma conducted any investigation of what materials Mr. Kennedy might have taken with him.  In fact, months went by before Proforma even thought to conduct any such diligence.  Not until an errant payment in June 2022 did Proforma undertake an investigation into the accounts or other information Mr. Kennedy might have taken with him.  Relying on the good faith of a departing franchisee, particularly in the contentious circumstances between Mr. Kennedy and Proforma does not show reasonable precautions to protect trade secrets.

*Third*, the record shows that Proforma failed to monitor downloads from the Proforma System in real time (or reasonably close in time).  To the contrary, as a

matter of course Proforma allows departing franchisees to continue to have access to the Proforma System to facilitate transition of their business and complete outstanding orders.  Indeed, according to the testimony of the company's chief technology officer, Proforma prefers not to engage in "witch hunts" or to limit access for good users because of the potential for harm from bad actors.  But the law requires the holder of trade secrets to take reasonable steps to maintain secrecy.  Monitoring file downloads requires only minimal diligence of which a franchisee or other user of the Proforma System would not even be aware.  Particularly in the context of a contentious departure of a successful franchisee, the law requires some effort to police file downloads or restrict access to valuable trade secrets.  And even after Proforma learned of Mr. Kennedy's conduct of which it complains, it still did not shut off his access to the Proforma System, which he maintained as recently as the days before the hearing on Plaintiff's motion for preliminary injunction.

For these reasons, Plaintiff has not carried its burden to show that it is likely to succeed on its trade secret claim against American.  Accordingly, the Court need not consider the remaining elements of the claim or the other considerations under Rule 65 for the issuance of an injunction.

### I.B.    Tortious Interference Claim

Under Ohio law, "to establish a claim for tortious interference with a business relationship, a party must show:  (1) a business relationship or contract; (2) the wrongdoer's knowledge of the relationship or contract; (3) the wrongdoer's intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting

damages." *Bowshier v. Chrysler Fin. Corp.*, 144 F. Supp. 2d 919, 926 (S.D. Ohio 2001) (citations omitted). A person cannot interfere with his own business relationship or a contract to which he is a party. *Kenyon v. Union Home Mortg. Corp.*, ___ F. Supp. 3d ___, No. 1:21-cv-01426, 2022 WL 189094, at *4 (N.D. Ohio Jan. 21, 2022).

To the extent Plaintiff seeks an injunction based on a claim of interference in Proforma's relationships with other franchisees, that claim is not likely to succeed on the merits. Even assuming that American is deliberately targeting high-performing Proforma franchisees for recruitment, the record at the preliminary injunction hearing established than any Proforma franchisee may terminate its franchise agreement, without cause, at any time so long as it pays the account acquisition fee. Further, the evidence shows that, of all the Proforma franchisees who American or Mr. Kennedy might have solicited, the only one who has failed to pay the fee even in part is Mr. Kennedy.

As to Plaintiff's claim that Defendants induced other franchisees to breach the confidentiality provisions of their franchise agreements, that presents a closer question. Although American clearly possesses confidential and proprietary information from the Proforma System, including some that constitutes trade secrets, based on the record the Court cannot say that American has accessed—let alone used—that information. Forensic investigation might show otherwise. But without evidence that would show American is using that information to compete, Plaintiff has not carried its burden. Accordingly, Plaintiff has not shown a likelihood of success on the merits at this time.

### I.C.    Breach of Contract Claim against the Kennedys and BKEN

Plaintiff contends it has a strong likelihood of success in establishing its breach of contract claim against the Kennedy Defendants.  (ECF No. 3, PageID #93.)  The Kennedy Defendants object to Plaintiff's renewed breach of contract claim in Count VI.  (ECF No. 17, PageID #146–47; ECF No. 1, ¶¶ 111–23, PageID #24–25.) They contend that Plaintiffs are attempting to litigate the same claim previously raised in the related case mentioned above.  (ECF No. 17, PageID #146.)  Although Defendants might move to dismiss these claims or assert other defenses on this basis, no such motion is pending, and the only matter before the Court is Plaintiff's motion for preliminary injunction.  Therefore, the Court proceeds to analyze Plaintiff's likelihood of success on this claim.

Plaintiff bases its claim on the 2014 franchise agreement with BKEN, which the Kennedys guaranteed.  By the terms of the agreement, Ohio law governs this claim.  (ECF No. 1-1, PageID #44.)  Under Ohio law, "[t]o establish a claim for breach of contract, a plaintiff must prove:  (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach." *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (citing *Claris, Ltd. v. Hotel Dev. Servs., LLC*, 2018-Ohio-2602, 104 N.E.3d 1076, ¶ 28 (Ohio Ct. App.)).

Under the franchise agreement, if a departing franchisee fails to pay the account acquisition fee, that franchisee may not contact any customer, vendor, or supplier.  (ECF No. 1-1, ¶ 11(c), PageID #39.)  In Mr. Kennedy's case, because he testified that he effectively had no business of his own before becoming a Proforma

franchisee, this term of the contract prohibits contact with *any* of his vendors or suppliers.  (*See id.*, ¶ 11(c)(ii).)

Though the parties dispute the amount Mr. Kennedy might still owe for the account acquisition fee, Mr. Kennedy conceded at the evidentiary hearing that he has not paid in the fee in full.  Accordingly, with respect to customers, vendors, and suppliers, Plaintiff might well prevail on a claim for breach of contract.  If so, the franchise agreement provides a method for valuing the claim with money damages, in addition to other remedies available at law.

As to Mr. Kennedy's confidentiality obligations under the franchise agreement, Paragraph 8 obligates him not to disclose certain specified confidential information and trade secrets.  (ECF No. 1-1, ¶ 8, PageID #38.)  Specifically, the Kennedy Defendants may not disclose (1) Proforma's Confidential Operations Manual (*id.*, ¶ 8(a)); (2) any contents from the Proforma System (*id.* ¶ 8(b)); (3) Proforma University training materials (*id.*, ¶ 8(c)); or (4) Proforma training materials or manuals (*id.*, ¶ 8(d)).  With respect to the first three of these items, the franchise agreement permits disclosure pursuant to a confidentiality agreement of indefinite length, but no such exception applies to the fourth category. (*Id.*)  Here, Mr. Kennedy insisted on a nondisclosure agreement with American before providing them information.  Because the terms of that nondisclosure agreement are not part of the record, the Court cannot say one way or the other whether it discharges Mr. Kennedy's obligations under Paragraph 8.  Therefore, Plaintiff has not carried its burden of establishing the likelihood of success on the merits of its breach of

contract claim on the first three categories of trade secrets identified in Paragraph 8 of the franchise agreement.

As for the fourth category, which the franchise agreement describes as "Proforma System training materials, Manual or [the] Team Proforma 400 Program and Group 2 Program," the parties' contract does not contain the same exception to disclosure even with a confidentiality agreement. Paragraph 8(d) prohibits unauthorized "copy[ing] or disseminat[ion] of the contents" of the identified materials. In his testimony, Mr. Kennedy conceded that he retained and copied certain information, which is likely included in the material described in this Paragraph. Therefore, Plaintiff is likely to succeed on its breach of contract claim with respect to the items specifically identified in Paragraph 8(d).

## II. Irreparable Injury, Substantial Harm, and the Public Interest

Paragraph 8(d) of the franchise agreement provides that "[u]nauthorized use or disclosure of the Proforma System training materials, Manual, or [the] Team Proforma 400 Program and Group 2 Program contents will cause irreparable harm to [PFG Ventures] and the System." Further, that Paragraph stipulates that "legal damages could not adequately compensate [PFG Ventures]" and that "a court should enjoin you from any further unauthorized use of disclosure of the Proforma System, Manual, our Team Proforma 400 Program, Group 2 Program or their contents." Although the parties' agreement might satisfy the additional requirements for the issuance of an injunction, the law does not presume injury and requires proof of harm, even where a contract provides otherwise. *See, e.g.*, *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 970 (6th Cir. 2002); *TGR Ents., Inc. v. Kozhev*, 167 Ohio App. 3d 29,

2006-Ohio-2915, 853 N.E.2d 739, ¶ 36 (Ohio Ct. App.).  Therefore, the Court analyzes the other requirements for issuance of an injunction without regard to the contract.

### II.A.  Irreparable Injury

Where money damages do not fully compensate for an injury, a plaintiff's harm is irreparable.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (quoting *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)).  Money damages do not fully compensate an injury where the nature of the loss makes damages difficult to calculate.  *Id.* (citations omitted).

Against this standard, Proforma argues that it will suffer irreparable injury absent an injunction because it will be unable fairly to compete in the marketplace and may lose customer goodwill.  (ECF No. 24, PageID #233.)  Proforma contends that an injunction is necessary to protect the enforceability of its confidentiality agreements and to maintain credibility with existing and future franchisees.  (*Id.*, PageID #233–34.)  Defendants counter that Proforma's injury, if any, is fully compensable with an award of monetary damages.  (ECF No. 22, PageID #210–11; ECF No. 23, PageID #223.)  Defendants point out that the franchise agreement provides a formula for calculating the account acquisition fee which, if paid, fully compensates Proforma.  (*Id.*)  This argument misses the mark.  Though the account acquisition fee compensates Proforma for any breach by Mr. Kennedy regarding contact with customers, vendors, and suppliers, it does not compensate for unauthorized disclosure of trade secrets, even ones defined under the franchise agreement instead of under State law.

22

At the preliminary injunction hearing, the evidence clearly established that Proforma takes steps to preserve and maintain the confidentiality of its system for doing business, both for its own benefit and that of its franchisees.  Quantifying the loss from breach of the franchise agreement, if proved, will present significant challenges.  Moreover, an injunction better vindicates the nature of the confidentiality interests at issue than an award of damages can.  After all, damages cannot unring the bell from disclosure.  In this regard, this case presents a clear case of irreparable injury based on the record at this stage of the proceedings.

## II.B.  Substantial Harm to Others and the Public Interest

Proforma maintains that a preliminary injunction would cause no harm to Defendants.  (ECF No. 24, PageID #235.)  Further, it argues that an injunction serves the public interest by protecting the right to contract freely and promoting the public's interest in fair competition.  (ECF No. 24, PageID #235.)

No evidence at the preliminary injunction hearing suggests that any third party would suffer harm, let alone substantial harm, from an injunction.  To the extent an injunction tailored to the scope of Paragraph 8(d) harms the Kennedy Defendants, the franchise agreement provided them with offsetting benefits.  If the public interest bears on this contract dispute between private parties, it does not tip the balance one way or another.  Accordingly, the Court determines that Plaintiff has carried its burden under Rule 65 for the narrow injunction directed at the materials described in Paragraph 8(d), as specifically set forth below.

23

### II.C. Bond

Finally, the franchise agreement provides that Proforma "will be entitled to obtain, without bond, . . . temporary and permanent injunctions . . . to enforce the provisions of this Agreement." (ECF No. 1-1, ¶ 19(a), PageID #43.) Again, the Court will not defer to a contractual recitation and, instead, analyzes the requirement for a bond under the applicable legal rules. Rule 65(c) provides that a court may only issue an injunction "if the movant gives security" in a proper amount. Under the law of this Circuit, however, a district court has discretion whether to require the posting of a bond or other security. *See Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.,* 714 F.3d 424, 431 (6th Cir. 2013) (quoting *Moltan Co. v. Eagle-Picher Indus., Inc.,* 55 F.3d 1171, 1176 (6th Cir. 1995)).

The Kennedy Defendants argue that a substantial bond should be required before the issuance of an injunction that would effectively put them out of business. But no evidence suggests that the narrow injunction Paragraph 8(d) contemplates would have such a drastic effect. In the absence of such evidence, the Court determines that no security is required. The record shows that these Defendants will suffer little, if any, harm from an injunction that merely enforces the contract to which they previously agreed and from which they benefitted.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** the motion for a preliminary injunction. Therefore, pursuant to Rule 65(a) and Rule 65(d)(1) & (2), the Court **ENJOINS** Defendants BKEN, Inc. (and its officers, agents, and employees) and Brandon and Christina Kennedy from any further

unauthorized use or disclosure of the Proforma System training materials, Manual or the Team Proforma 400 Program and Group 2 Program until further Order of the Court.

      **SO ORDERED.**

Dated:  July 22, 2022

 

                    _____

                         J. Philip Calabrese
                         United States District Judge
                         Northern District of Ohio